CHILD *against* CHAPPELL.

Ejectment only lies for something tangible, of which the possession may be delivered by the sheriff to the plaintiff.

The claim of a right to use a wharf, situated on the margin of a canal basin, for the purpose of loading and unloading boats, carrying wheat and flour to and from the mill of the claimant adjoining the wharf, as an easement appurtenant to the mill, in common with a similar right in others, and the occasional exercise of such right or claim, do not constitute such possession or claim of interest in lands as to subject the claimant to an action of ejectment.

The acceptance of a lease and the payment of rent for the use of such wharf, do not, after the expiration of the term, estop the lessee from asserting a right to use it without the consent of the lessor.

In this case, the court held that the defendant established his right to the easement claimed, both by direct grant and upon the principle of dedication.

THIS was an action of ejectment, commenced in the supreme court in the year 1845. The plaintiff claimed to recover a wharf, about seven feet wide by about forty feet in length, lying on the east side of a basin of the Erie canal at Rochester, and in front of a flour mill belonging to the defendant, situated upon a certain mill-seat lot number five, and also to recover an undivided half of the land under water constituting that part of the basin in front of said lot number five. The cause was tried in September, 1845, before N. DAYTON, late circuit judge.

In opening the case the plaintiff's counsel stated his own claim to be as above mentioned, and that the defendant owned the mill lot number five, and occupied the mill situated thereon, and claimed the right to use the dock and basin in front of his mill, and to load and unload boats for

Child *against* Chappell.

that purpose, and had actually used them in that manner; and that it was to try the defendant's right so to use them that the action was brought.

From the evidence it appeared that prior to 1817, Charles Carroll, Nathaniel Rochester and William Fitzhugh were the owners of one hundred acres of land adjacent to the falls on the Genesee river and now included within the bounds of the city of Rochester. In August, 1817, they made partition of the tract, according to a plan or map annexed to the deed. Upon this plan considerable unallotted space was laid down, marked "mill yard," as to which, and the mill races, water and alleys, it was covenanted that the same were to be held and owned by the parties, "their heirs and assigns, *for their common use* as tenants in common forever;" but it was also covenanted that they might at any time thereafter, *by mutual agreement*, sell and convey or *otherwise appropriate* such part of the mill yard as they might think would not be necessary for the accommodation of the mills and other waterworks erected, or such part of the alleys as they might think proper to divide among themselves or to dispose of.

On the 19th day of September, 1822, the three individuals above mentioned executed another partition deed, reciting the former one, by which they relinquished in part the partition thereby made; laid out new lots upon part of the mill yard and altered the lines of some of the lots on the former map, and made a new division of those lots among the three proprietors. By this partition, mill-seat lots numbers five and six were released to Nathaniel Rochester; lots three and four were released to Fitzhugh, and seven and eight to Carroll. By the plan annexed to this deed, all these lots, numbers three, four, five, six, seven and eight, extended along a raceway, and were made to front westerly on a narrow strip marked "common way," adjoining which, still on the west, a space was marked out, connected on the south with the Erie canal, and marked "Basin," and occupying a part of the ground

which, on the plan annexed to the first partition deed, comprised the mill yard. The last mentioned deed contained the following clause: "And it is further covenanted and agreed by and between the several parties to this indenture, that a *basin* shall be made as laid down on the annexed plat, at the equal joint expense of themselves, their heirs and assigns, which basin shall be the *common property* of the parties to this indenture, their heirs and assigns *forever*." The deed contained a provision that each of the parties might "forever have and enjoy the privilege of erecting and maintaining one or more warehouses from" the mill-seat lots released to such party "across the said road and common way *to the margin of the basin;*" "each and all of said warehouses, whenever built, shall be on posts thirteen feet apart, and the floors thereof to be ten feet from the ground, so as not to obstruct the free passage on the said road or common way." As to the road or common way, the deed provided that it should be laid out as marked on the plat annexed, and *forever kept open* "as a common way to and from the mills and seats on the ,race-way, and to the basin and to the warehouses adjoining and over the same." Other roads marked out on the plan, intersecting the one between these lots and the basin, were to be kept open forever as roads and common ways, and part of a lot was relinquished and appropriated forever as the site of a bridge across the aqueduct. It was also provided that nothing contained in that indenture "should interfere with or impair any right or privilege acquired by or secured to either of the said parties under their former deed of partition," except as expressed in the present deed.

On the 8th day of October, 1822, Nathaniel Rochester and his wife for the consideration of $1000 conveyed to Harvey Montgomery and Thomas H. Rochester, mill-seat lot number five, as known and described in the last mentioned deed of partition, "as by reference to said deed of partition and to the plat thereto annexed will more clearly

appear, together with all the privileges and immunities and subject to all the limitations and restrictions as are expressed and provided for in the said deed of partition above referred to."

It was admitted that the defendant on the 12th June, 1840, acquired title to mill-seat lot number five through the last mentioned deed.

On the same 8th day of October, 1822, Nathaniel Rochester and his wife conveyed to the plaintiff a large number of lots which had been released to said Rochester by said partition deeds, and among others mill-seat lot number six as laid down in the plat annexed to the last partition deed ; " also one equal undivided third part of all the ground which the said Nathaniel Rochester now holds in common with Charles Carroll and William Fitzhugh," within certain prescribed bounds, and including the part designated for the basin. The deed then provides that " the undivided third part thereof hereby intended to be conveyed shall be subject to all the liabilities which the said Nathaniel Rochester has by covenant in the said last mentioned deed of partition incurred, in common with the said Charles Carroll and William Fitzhugh, for the construction of such basin, and also the privilege of erecting and maintaining forever one or more warehouses from mill-seat lots numbers five and six across the highway running along the west side of the race-way to that part of the margin of the basin," &c., describing the distance along the margin of the basin which the warehouses might occupy, and defining the height of the posts, floor and braces of the warehouses as in the last partition deed, and proceeds: " The whole of the hereby granted premises being subject to all the conditions, limitations and restrictions contained and expressed in the last mentioned deed of partition." It was shown that the sale of lot number five by Nathaniel Rochester to Montgomery and Rochester, was made with the plaintiff's assent before the last mentioned deed to the plaintiff was given.

Child *against* Chappell.

The plaintiff also gave in evidence a deed to himself from Carroll, dated December 10th, 1823, of his undivided third of the piece of land set apart and marked on the diagram for the canal basin.

It was shown that the basin was excavated in 1823, by the three parties to the partition deeds, and it has since been kept in repair by them and by the persons to whom lands have been conveyed fronting on it, under the supervision of the city authorities. Montgomery and T. H. Rochester, while they were the owners of mill lot number five, paid rent to the plaintiff for the use of the basin and dock. The defendant also, in July, 1842, took a lease from the plaintiff for the wharf in front of his flouring mill and for the use of the basin, and paid rent therefor until January 1, 1844, after which he claimed that he had a right to use them for the purposes of his mill without the payment of rent. He continued to make use of them from that time until the commencement of this suit; and on the day the declaration was served a boat was lying in the basin opposite the mill discharging a cargo of wheat. What is called the *wharf* is the top of the east wall of the basin, which is about seven feet thick and covered on the top with plank, and is wholly within the line of the basin as laid down on the diagram annexed to the partition deed. The common way spoken of runs between this wall and the west line of the lots.

The defendant moved for a nonsuit on the grounds (among others) that the defendant had done no act to subject him to this action, even if he was not entitled to use the dock and basin; that the plaintiff had not such a title to the premises as would enable him to maintain ejectment; and finally, that under the partition deed of 1822 and the conveyances under which he held the mill lot, he was entitled to an easement in the wharf and basin for the purposes for which he had used it. The judge nonsuited the plaintiff, who excepted. A motion to set

aside the nonsuit was heard and denied at a general term and judgment for the defendant was entered.

The cause was submitted on printed arguments by

*E. Darwin Smith* for the appellant.

*S. Mathews* for the respondent.

DENIO, J.   To render a party liable to an action of ejectment, he must be the actual occupant of the premises claimed if they are occupied by any one; if they are not so occupied, he must be a person exercising acts of ownership on the premises, or must claim title thereto, or to some interest therein, at the commencement of the suit. (2 *R. S.*, 304, § 4.) The defendant was not the occupant of the wharf or basin, and he was not shown to have exercised any acts of ownership on them.  His use of them was temporary and occasional, and not exclusive.  It was not different from that which is made of a street or highway, or a public landing-place on a navigable river or canal.  It did not constitute any pretension to the ownership, occupation or possession of the basin, and was not in itself possession or occupation.  The act of discharging or loading boats lying in the basin over the dock did not imply any claim to the ownership of that property. They were structures erected for the convenience and use of persons engaged in forwarding and transporting property on the state canals, and such use of them as was shown in this case was no more an act of ownership than the navigation of the canals would be of the canal itself.  As to claiming title : the defendant merely insisted that he had a right to use the basin and dock for the accommodation of his mill in bringing and taking away property which had been or was to be transported on the Erie canal.  He claimed simply an easement, which is not a title to land or an interest in land within the meaning of the statute. (3 *Kent's Com.*, 419 ; *Hewlins* v. *Shippam, 5 Barn. & Cress.*, 221.)

If being actually in the enjoyment of an easement on the land of the plaintiff does not subject a man to this action, it is impossible that the claim of a right to such enjoyment should make him liable.    Ejectment only lies for something tangible, something of which possession may be delivered by the sheriff to the plaintiff. (*Jackson* v. *May*, 16 *John.*, 184 ; *Doe* v. *Alderson, 1 Mees. & Wels.*, 210 ; *Crocker* v. *Fothergill, 2 Barn. & Ald.*, 652 ; 2 *R. S.*, 304, 306, 307, 308, 310, §§ 7, 8, 12, 25, 30, 33, 34, 41.)    I am of opinion that the claim of title, or of some interest in the premises, spoken of in the statute, must be such a claim as that, if it were reduced to possession or enjoyment, it would constitute an actual occupation of the premises, so as to authorize ejectment to be brought on that ground.    The wharf, it is true, is tangible property, but the defendant is not in possession of it, and does not claim to own it.    He only insists on a right to use it for passage, and perhaps as a place of temporary deposit for property received or sent by the canal.

But I am also of opinion that the court below was right in holding that the defendant was entitled to use the basin and wharf for conducting his business at the mill.    For an accurate understanding of the several partition deeds, it is necessary to consider the subject matter to which they relate.    The three proprietors who were parties to them being the owners of a tract of land upon which there was a very valuable water power, which had been improved to a certain extent by the construction of aqueducts or races, caused it to be laid out into lots for mill sites and other lots, with alleys between the lots and on the sides of the mill-race, and with certain yards for the accommodation of the business of the mills.    These were laid down on a diagram annexed to the first partition deed, and referred to in it; and by that deed the proprietors covenanted with each other that the water to be introduced into the races, the *mill yards* and the alleys, should be held and owned by them, the proprietors, their heirs and assigns forever, for

Child *against* Chappell.

their *common use* as tenants in common, with a reservation, however, made for greater caution, that they might by mutual consent dispose of any parts of the mill yards which they might afterwards consider unnecessary for the accommodation of the mills and water-works. The second partition deed was a modification of the first, and not an entire abandonment of it. The location and boundaries of some of the lots were changed, and a portion of the yards appropriated for the common use by the first deed was laid out into additional lots and divided between the proprietors. The basin provided for by the second deed was to be made and was afterwards actually made upon a part of the mill yard reserved by the first deed, and was so far a modification of the provisions of that instrument, but in all particulars not provided for in the second deed, the former one remained in full force. By the terms of the last deed the basin was devoted to the use and accommodation of the divided portions of the property, in language similar to that used respecting the mill-races, alleys and yards in the prior partition. To show more clearly the relation which the basin was to sustain to the mill-seat lots, the owners of the latter, their heirs and assigns, were by the deed allowed to extend the warehouses which they might erect on their lots, over the passage way between the lots and the basin, quite to the margin of the basin, leaving under those buildings a sufficient space for passing. The intention of the parties to appropriate in perpetuity the use of the basin and the means of access to it from the mill lots, to the accommodation of those lots and to the mills and other erections which might be constructed upon them, is as plain and explicit as it could be made by language. Neither the aqueducts or races, the water power or the common way, are more firmly annexed to the mill lots than the use of the basin. They are all of the same general nature, set apart for the same objects, and their relation to the divided property is of precisely the same character. It is not

necessary to inquire what remedy there would have been in favor of a purchaser of one of these mill lots upon the covenants to construct the basin, if the proprietors had neglected to perform that work, for there was no such neglect; the basin was excavated according to the provisions of the deed. It was no doubt competent for the proprietors, before they had conveyed any portion of the divided property to others, by common. consent to have modified or rescinded the provisions respecting the undivided portions; and I presume either of the proprietors could, by express provisions in the conveyance of a lot to a stranger, have restricted him in the enjoyment of any of the rights relative to the common property created by the partition deeds. This, however, was not done in the deed of mill-seat lot number five, owned by the defendant. In the conveyance of that lot by Nathaniel Rochester, one of the three proprietors, to Rochester and Montgomery, so far from there being words excluding the grantees from the rights which the grantor possessed, the language seems to me to have been expressly intended to transfer those rights. The grantees were to have all the privileges and immunities and to be subject to all the limitations and restrictions which were expressed and provided for in the deed of partition. It is to be presumed that the grantees purchased with a view to the advantage which the rights which attached to the lot over the adjacent undivided property gave it, and that they paid a price grounded upon a consideration of those rights. The accommodation afforded by the canal may have been considered as important as that furnished by the water power, or by the avenues or common way. The right of the purchaser to the use of the former is provided for in precisely the same way as the right to the latter.

The intention of the parties to these instruments being sufficiently obvious, the next inquiry is what idea the law attaches to such arrangements respecting real estate. The

partition deeds in my opinion create a perpetual servitude, or in more modern language an *easement* in fee upon the undivided lands upon which the basin and wharf are situated, for the use and benefit of those parts of the original premises which were set off and released in severalty to the individual proprietors. These undivided lands are the servient tenement, and the released land became the dominant tenements. The easement or privilege is permanently annexed to the mill-seat lots, and becomes an integral part of the estate in them and of every part and parcel of them capable of being benefited by their enjoyment. They follow the estate benefited by the easement into the hands of any person to whom it may be assigned; and they constitute a perpetual incumbrance upon the lands burthened with them into whosesoever hands they may pass. (*Hills* v. *Miller*, 3 *Paige*, 256, 257; 2 *Kent's Com.*, 420; *Trustees of Watertown* v. *Cowen*, 4 *Paige*, 514.) The doctrine of servitudes, or of services of houses and lands, as it is called, is derived from the civil law, and constitutes an enlightened system of rules upon this subject, which have been generally adopted in England and in this country. (*Domat's Civil Law, book* 1, *tit.* 12, *vol.* 2, 205 *to* 219; 3 *Kent's Com.*, 435.) Servitudes of this kind, or easements as they are now called, are established, says Domat, by covenant, or by testament, or they may be acquired by prescription; or if *naturally necessary*, by the authority of justice. (*Domat, ib.*, § 10.) In this case they arise upon the explicit covenants of the three proprietors, contained in the partition deeds; and the right of the defendant to the advantage of them, in respect to the land owned by him, was acquired by the grant of that land after the easement in its favor upon the undivided land had been established by these covenants.

The foregoing view seems conclusive; but I am of opinion that the case likewise falls within the principle of *dedication*, which has been extensively applied of late years under similar

circumstances. The basin is connected with a public canal and was constructed for the sole purpose of facilitating traffic on that great thoroughfare. The act of laying it out in the diagram, covenanting for its excavation, and selling the lot to the defendant with express reference to the deed which contains the covenant and to the diagram, and with the right to extend an erection over the common lands to the margin of the basin, the only purpose of which must have been the use of the basin for the benefit of the lot conveyed, was, *quoad* the purchaser and the land purchased, a dedication of it to the use for which it was constructed. In the case of an express dedication it is not necessary that it should be followed by any length of user. (*Hunter* v. *the Trustees of Sandy Hill*, 6 *Hill*, 413, 414.) It operates immediately in the nature of an estoppel, upon the principle that to retract the promise implied by such conduct and upon which the purchaser acted, would disappoint his just expectations. (*City of Cincinnati* v. *White*, 6 *Peters*, 431; *Watertown* v. *Cowen*, 4 *Paige*, 510; *Livingston* v. *The Mayor, &c., of New-York*, 8 *Wend.*, 85; *Wyman* v. *The Mayor, &c., of New-York*, 11 *id.*, 486.)

This precise question was before the supreme court in reference to another of these mill-seat lots nearly twenty years ago, and it was held that the proprietor of each lot was, by force of the provisions of the partition deed, entitled to the use of the waters of the basin.

The deed from Nathaniel Rochester to the plaintiff, though dated on the same day with the one under which the defendant claims, was executed after the sale had been made to the defendant. Besides, the deed to the plaintiff did not profess to subvert the easement in the basin attached to the other mill lots. It passed the title to the soil subject to the provisions of the partition deeds in favor of all the mill-seat lots.

What is called the wharf or dock is a part of the basin. It is within the limits assigned to the basin in the diagram; and besides, the use of it by the person owning the defen-

dant's lot is essentially necessary to the use of the basin by such proprietor.

The lease from the plaintiff to the defendant, and the payment of rent by the latter and his predecessors in the title for the use of the basin and wharf, were acts done in ignorance of their rights. The plaintiff was not prejudiced by such payment, and there is no principle upon which it can be held that the payment estops the defendant from insisting upon his actual rights. The judgment should be affirmed.

MORSE, J. Where an owner of land lays it out in lots and streets, and exhibits the streets upon a map by which he sells and conveys lots so laid out, as between him and the purchasers of such lots, the spaces so laid down upon the map as streets are dedicated as such to the public use. This I understand to be the law, and in conformity to the principles of natural justice. The mere act of selling and conveying by such a map binds the grantor to permit the land so laid down as streets to be used as such. As between the parties, their heirs and assigns, it fixes the servitude of a public way upon the land thus laid out as streets. It is perhaps unnecessary now to consider whether such a grant as between the grantor and the public would be a dedication. I think it would not. No question was raised on the trial of this cause as to the intervening of any public rights between the making of the partition deed of August 13, 1817, and that of September 19, 1822. In some of the cases conveyances of this class are spoken of as dedications of the streets to the public. This must be understood with some qualification. I take a dedication to the public of land for a public highway to be something more than the act of the owner of the land. The dedication is not complete or binding until accepted by the public by user, or some other indication of acceptance. As the acceptance of a deed by the grantee of land will be presumed from the beneficial nature of the act, so as to give effect to the delivery,

Child *against* Chappell.

although there is no express evidence of an actual accept-
ance, so, as a rule of evidence, the acceptance of a dedica-
tion of land for public use may be presumed from the
beneficial nature of the dedication.    The transaction is,
however, in the first instance, strictly a private one as
relates to the streets, as much as it is a private one as
relates to the land actually conveyed.    The right to use,
and to have used by the public, the streets laid down upon
the map, has become an appurtenance to the parcel of land
granted.    And the same right belongs to each of the parcels
granted upon the same terms.    As between the original
owner of the land, and the several grantees of parcels
thereof, these rights are fixed, but until the public has in
some way become a party to the transaction, the whole
arrangement is subject to be rescinded by the joint act of
the original owner and of all those who own and have the
right to represent the land sold.    The principle established
is, that an owner of land may make any lawful disposition
of it which he deems most beneficial.    He may found a city,
a village, or an agricultural or manufacturing community at
his own free will, so far as the appropriation of his land
may go to effect such purposes.    He may adopt just such
measures concerning his land as to his judgment may seem
expedient.    I suppose it would nowhere be doubted that a
man owning a hundred acres of land through which there
ran no highway would be quite at liberty to inclose it with
a wall, and to erect a fenced town.    He might lay out streets
throughout the entire parcel, and collect a phalanx of social-
ists, having all the streets common and as among themselves
public; as to the world beside exclusive and private.    In
other words, there might be impressed upon this mass of
private property, by private contract, rights, in the strictest
sense of the word, analogous to the ordinary public rights
of highway, and yet these rights confined to the owners and
representatives of the land forming the subject of the com-
pact, and liable to be ended and rescinded by the mutual

consent of all who have an interest in the subject. The present case seems to furnish an illustration and a practical adoption of the principles to which I have alluded.

In 1811 Charles Carroll, William Fitzhugh and Nathaniel Rochester became the owners of a tract of one hundred acres of land, with extensive water power, "at the falls of the Genesee river in the county of Genesee," and subsequently laid out this land "in village lots, mill yard, &c.," and called it the village of Rochesterville, and caused a plan or plat of it to be made. They joined in the sale and conveyance of a part of the lots so laid out, and in contracts for the sale of other of said lots.

In 1817 (August 13) they made and executed a deed of partition of the lots then belonging to them in the village of Rochesterville, to which deed was annexed the plan or plat of the said village above referred to, "with the lots numbered and marked" thereon. Upon this map is laid down the "mill yard" in front of the various "mill-seat lots" designated upon the map as numbers one, two, three, four and five, including a race-way next to the mill-seat lots. There are also other lots fronting on this mill yard. There is no apparent way of access to these mill-seat lots except through or over the land thus laid down as the mill yard. It may as well be remarked here as elsewhere that this is by no means a case of a way of necessity. It is apparent that the only way to these mill-seat lots was over this mill yard. The use of the term mill yard implies that the ground so designated was to be used for some purpose connected with the mills, being evidently intended as a convenient way to the mills for the ordinary purposes of a mill yard, where teams may not only pass and repass, but where they may remain for a sufficient length of time to perform the ordinary purposes of a place set apart for such a use. It was the evident intention of the parties to this plan, and to the deed to which the plan was annexed, that each should have the use of this yard for all the reason-

able purposes of his mill-seat lots fronting on it; and to have such use, not as a personal privilege or in the nature of a common in gross, but as annexed to the land. It was to be held in severalty and as an appurtenant thereto. There would be no sense in laying down this mill yard in front of these mill-seat lots, unless its use was to have some connection with the enjoyment of these lots. This deed confirmed to Carroll in severalty, among others, "mill-seat lot No. 5" fronting on the mill yard. The parties to this deed perfectly understood and agreed, what the purposes of this mill yard were. They reserved to themselves the right, by mutual agreement, to "sell and convey or otherwise appropriate such part of the mill yards as they may think will *not be necessary for the accommodation of the mills or other water-works erected,* or such part of the alleys hereinbefore mentioned as they shall think proper to divide among them or dispose of." While the rights of no other party intervened, they had a right to reconstruct, alter or modify the easements created and made appurtenances to parts of the land set off to be held in severalty by each. So they had equal power to reconstruct the plan of the lots, alleys and yards. The whole was their own and they might do whatsoever they would with it. But until they did mutually agree to the contrary, the mill yard remained a common way — common to those who had interests in the mill-seat lots fronting upon it — constituting to each lot an easement appurtenant to it; not by prescription, but by what a prescription implies, a grant.

On the 19th September, 1822, the parties to the partition deed of August 13, 1817, together with their respective wives, executed a new deed of partition by which they in part reconstructed the plan of the village of Rochesterville. They laid off seven additional mill-seat lots on ground which remained undivided and which was designated on the plan as mill yard. These lots are not upon that part of the yard which now forms the basin. That part of the mill

yard which now forms the basin and the passage along its margin was the only outlet from the mill-seat lot number five and some others. A way of necessity would have been charged upon this part of the mill yard, if it had not been reserved and laid out as a way by the plan, as there appears to be no other way to reach the mill-seat lots. In this reconstruction of the plan, and, in part, new distribution of the land, mill-seat lot number five was set apart to Nathaniel Rochester. It was covenanted by the parties to this deed that a basin should be made as laid down upon the plat at the joint expense of themselves, their heirs and assigns, and that such basin should be the common property of such parties, their heirs and assigns forever. This deed also provides that "Nathaniel Rochester, his heirs and assigns shall forever have and enjoy the privilege of erecting and maintaining one or more warehouses from his mill-seat lots Nos. 5 and 6 across the same road and common way to the margin of the basin." The road to which the above recited covenant refers is provided for in other parts of the deed, and occupies the space between the basin and the mill-seat lots from Nos. 1 to 8. This road and the basin occupies the same ground as the mill yard, on the plan annexed to the deed of 1817, occupied. The only alteration attempted in relation to this ground is to convert it from an ordinary land way into one partly by land and partly by water. Although that part of the way which is to remain a way by land may be built over by the parties respectively to whom mill-seat lots were set off by the partition deed, their heirs and assigns, yet it must be done in a particular manner, and so as to allow of the full beneficial use of the way "to and from the mills and seats on the race-way, and to the basin and to the warehouses adjoining and over the same." The deed provides expressly for that, which if not expressed would be implied, i. e., "that nothing contained" in this deed of 1822 "shall interfere with or impair any right or privilege acquired by or secured to either of the

said parties under their former deed of partition, except so far as it is herein expressed or provided for."

On the 8th day of October, 1822, Nathaniel Rochester made this deed to Jonathan Child the plaintiff, conveying a large amount of the property laid down upon the plans annexed to the two deeds of partition above mentioned, and among the rest of one equal undivided third part of the land designated upon said plat as "Basin," subject to the covenant of the grantor for the construction of the basin. The privilege of erecting and maintaining forever one or more warehouses from mill-seat lots numbers five and six across the highway running along the west side of the race-way to the margin of the basin, is also granted by this deed. By deed of December 10, 1823, Charles Carroll conveyed to the plaintiff one-third part of the mill yard, including the basin then excavated and walled, and adjoining the grand canal.

On the 8th October, 1823, the said Nathaniel Rochester and wife conveyed mill-seat lot number five to Harvey Montgomery and Thomas H. Rochester. The defendant's title is derived from this deed. There is nowhere any indication of an intention to strip mill-seat lot number five of any of its appurtenances. The common way, called in one of the deeds *highway*, between the lot and the basin, is carefully preserved, and preserved, as I understand the deeds and plans, to the margin of the basin. Over that space the defendant had a clear right of way for the purposes of his milling business carried on upon mill seat number five. It was the exact purpose of the deeds of partition to secure just that right of way. The basin is a way of another class, but, as a way, having the same qualities. The defendant had a right to the reasonable use of these ways. But even if he had no right to use these ways, still the ways existed for some purposes, and he used them as ways and only as ways, assuming that he had a right to do so. That was not taking possession of the land, nor was it, I apprehend,

claiming an interest in the land within the meaning of the statute. He claimed a right to pass over the land, both that which was used as a road and that which was within the basin and covered with water. It was an incorporeal hereditament which he claimed, a thing incapable of livery of seizin. The sheriff could not deliver possession of a mere right of way. I am of the opinion that the judgment of the supreme court ought to be affirmed.

TAGGART, J., dissented from the foregoing conclusions.

All the other judges concurring,

Judgment affirmed.