(Nitzell *v.* Paschall.)

---

[PHILADELPHIA, January, 17, 1831.]

## NITZELL *against* PASCHALL.

### APPEAL.

Testator, being the owner, in whole or in part, of four contiguous tracts of land, which were in part bounded by a water course, devised one of them, situate on the west side of the water course, to his son *B.* under whom the plaintiff derived title. To his son *H.* the defendant, he devised his " undivided moiety of certain four acres, called 'the saw mill land,' together with all the *rights* and *privileges* thereunto appertaining." This undivided moiety of the four acre tract had come to the testator with a privilege appertaining to it, of swelling the water back to the southern boundary of the land devised to his son *B.* By the same will, the testator gave to his son *H.,* the defendant, the privilege of erecting a dam, at any point between the land devised to his son *B.,* (the plaintiff's land,) and the land on the eastern side of the creek, devised to another son *I.,* with a right to dig a race through *I.'s* land. The defendant erected a dam across the creek within the limits mentioned in the last devise; and afterwards erected another dam, at a considerable distance below, for the use of "the saw mill land," where there had many years before been a dam erected, but the use of which had been abandoned, at least thirty-eight years.                     *

*Held,* that the whole of the property in the water course under the testator's control, passed by these devises to the defendant : that having been used by him in part, by the erection of the first dam, no presumption could arise from lapse of time, of any release or extinguishment of his right to any other part of it, and that consequently he had a right to erect the second dam. .

APPEAL from the Circuit Court of *Delaware* county, in an action on the case, brought by *Jacob Nitzell* against *Henry Paschall,* to recover

(Nitzell *v.* Paschall.)

damages for an alleged injury done by the defendant, by erecting a dam across *Cobb's Creek*, and thereby causing the water to overflow the plaintiff's land, situate on the west side of the creek.

The cause was tried before GIBSON, C. J. in *August*, 1830, when a verdict was given for the plaintiff for thirty dollars damages. The defendant moved for a new trial, and the motion being overruled, and judgment rendered on the verdict, he entered an appeal to this court.

The plaintiff derived his title to the premises under a deed from *Benjamin Paschall*, who held them under the will of his father, *John Paschall*, dated the 16th *November*, 1774. *John Paschall* derived his title under a conveyance from *William Garrett* and *James M'Clees*, executors of *Everard Ellis.*

The defendant claimed a right to erect and maintain his dam, under the following devise in the will of the said *John Paschall*:—

"I likewise give and devise to my said son *Henry Paschall*, his heirs and assigns for ever, the free right, liberty and privilege, to construct and make a dam across *Cobb's Creek*, at such place as shall appear best for that purpose, between my land, that was late *Everard Ellis*,' and my land I lately bought of *Swan Rambo*, or any other land on the easterly side of the creek, that may be hereafter purchased," &c.

"I also give and devise to my said son *Henry*, all that my moiety, or undivided half part of, and in, certain four acres of land called, "the saw mill land," lying by the side of *Cobb's Creek* aforesaid, held in partnership with *Isaac* and *Hugh Lloyd*, together with all my rights and privileges thereunto appertaining, to hold to him, my said son *Henry Paschall*, his heirs and assigns, for ever."

The devise to the testator's son *Benjamin Paschall*, of the land on the west side of the creek, was expressly subject to the rights and privileges given to the defendant.

About the year 1800, the defendant built a dam across *Cobb's Creek*, at a considerable distance above the one which was the subject of the present complaint, and within the limits mentioned in the first devise. The upper dam was, at the time of the trial, owned by *Levis Passmore*, and it was contended on the part of the plaintiff, that in erecting that dam, the defendant had fully satisfied the devises in his father's will.

For the purpose of shewing that a right to erect a dam was appurtenant to the four acre tract called "the saw mill land," the defendant gave in evidence the following chain of title, *viz.* A patent for one hundred acres of land, including the site of his dam and mill, dated the eighteenth of the sixth month, 1689, to *Peter Cock*, and twenty three others, as tenants in common.

This patent, recites that the said hundred acres of land were granted by virtue of a warrant from the proprietor and governor, bearing date the thirty-first of the fifth month, 1684, and laid out by the Surveyor General's order, the seventh of the sixth month, 1684 unto the

said *Peter Cock,* and others, *old Renters,* which hundred acres of land *was granted* by the said proprietor and governor to the said persons, their heirs and assigns forever, *for the use, benefit, privilege and accomodation of the mill within the same included, and for no other use whatsoever;* and grants and confirms the said hundred acres to the said patentees, their heirs and assigns, (but for the only use, benefit, privilege and accommodation of the said mill :) to be holden of the said proprietor, &c. as of his manor of *Springettsbury,* &c. " *they fencing and building thereupon according to regulation.*"

In the years 1699 and 1700, the shares of twenty of the patentees became vested, by various conveyances, in *John Bethell,* the elder. The conveyances to *Bethell,* all mention the mill, as then existing, and in seven of the deeds, it is called " an old mill."

In the will of *John Bethell,* dated *February* 20, 1707–8, the property is spoken of as " the hundred acres he bought of the Swedes, *being then in his possession.*"

After *John Bethell's* death, his twenty shares, with the possession, became vested in his son *John Bethell,* the younger, who, in 1714, purchased another share.

*John Bethell,* the younger, by his will, dated April thirteenth, 1725, devised the hundred acres, calling it, " the mill creek land," to his wife and executrix, *Rose Bethell,* with power to sell.

In 1727, *Rose Bethell* conveyed to *Read* and others, seventy six acres on the *Philadephia* county side of *Cobb's* Creek, being part of the hundred acres, with the right to join a dam or dams to other land of the said *Rose Bethell,* on the west side of the creek.

In 1730, *Read* and others conveyed to *Obadiah Johnsons,* the land and privileges granted to them by *Rose Bethell.*

In 1742, *Obadiah Johnsons,* by deed, reciting that he had " allotted and appropriated four acres" of the land conveyed to him by *Read* and others, " for the use and benefit of a saw-mill," and that he had granted one moiety of the said four acres to *Joseph Bonsall,* and that he and *Bonsall* had erected thereon a dam and saw mill ; grants the other moiety of the said four acres, with the saw-mill and privileges appurtenant to the above named *John Paschall.*

In 1747, *John Pascall* purchased from the heirs of the patentees, the three outstanding shares of the hundred acres.

*John Paschall,* by his will, dated *November* 16, 1774, devised to his son *Henry,* the defendant, " all that, his moiety or undivided half part, of and in certain four acres of land, called " the Saw-mill land," lying by the side of *Cobb's* creek, together with all his rights and privileges thereunto appertaining."

The moiety of the four acres held by *Joseph Bonsall,* became vested, by a series of conveyances, in *Hugh Lloyd,* who conveyed the same, in the year 1800, to the defendant.

The defendant is also entitled, under the residuary clause of *John Paschall's* will, to the three shares of the patent purchased by him in 1747.

(Nitzell *v.* Paschall.)

It was testified, by the witnesses of both parties, that they had seen the remains of an old dam, where the present dam is built. A log with some of the braces pinned on it, and a part of the embankment on the west side, were to be seen, before the defendant built the dam, which was washed away in 1819. It was also in evidence, that there were no traces of any dam ever having existed below the scite of the present dam, which was the lowest on the creek, and but twenty or thirty feet above the head of tide water.

It was further in evidence, that the natural fall of the creek, between the scite of the dam, and the place where the upper line of the patent crosses the creek, was very small, not more than from one to two feet; and also, that the power which the present dam gave the defendant, was not more than was necessary for the small saw-mill he had erected. The witness called the power, " a very weak one."

GIBSON, Chief Justice, charged the jury as follows:

It is clearly proved, that the defendant has raised the water in the plaintiff's watercourse, and flooded a portion of his land, and the latter will therefore be entitled to damages, unless the defendant can show, that he has a license to do so from some one authorised to grant it. The defendant claims this license under his father's will. The father owned all the land on the diagram, that is to say, the old patent of one hundred acres, *Pannell*'s land, *Nitzell*'s land, and *Rambo*'s land, and had a right, if he thought proper, to give any one a right to flood either of these tracts. The question is, did he give the defendant a right to flood *Nitzell's* land? It is certain he has not done so, expressly as regards the dam in question. He gave the defendant a right to do so by a dam higher up the creek, and that dam has been erected and parted with to a purchaser. The defendant claims by another devise, in which he gives his half of the four acre mill tract to the defendant, " together with all *his* rights and privileges thereunto appertaining." Was there then any *right* attached to these four acres in the hands of the testator's father, independent of his general power as owner of both tracts, (for that is all which he has devised,) to authorise the owner of the four acres to flood *Nitzell's* land? For it is certain that he gave it with no greater privileges than were attached to it when he got it.

There can be but one origin for this right; and that is, if there be any such right, the patent for the one hundred acres, of which the four acre mill tract was originally a part. In the patent, there is a clause which declares the grant to be for the use of a mill then erected and in operation. It is said, that this mill could not have been effective for any useful purpose, without occupying all the water-power used at this day; consequently, that the right of the patentees to do so was ratified by *William Penn*, the owner of all the lands above. Was he then the owner of the lands above? There is no proof of it; but, perhaps it ought to be taken to be so, the proof resting on the plaintiff.

(Nitzell *v.* Paschall.)

But whatever the rights of the owners of the original mill may have been, they have clearly been lost by lapse of time. The mill was in operation in 1689, since when we have no account of it, except that a saw mill is mentioned in *Obadiah Johnson's* deed, in 1742. The deposition of Judge *Lloyd*, now ninety years of age, may be supposed to go back eighty years, as he speaks of knowing the place in his boyhood, and he says nothing of the mill being in operation then. It is probable that it did not last many years after its erection; the first attempt at improvements of this sort being very imperfect, and generally superseded by better and more perfect erections. Then for more than seventy years, it is pretty clear, that this dam was abandoned. And if so, the right was lost in 1825, when the present dam was erected.

There is a particular reason why this privilege should be forfeited by *non user*. The consideration for the grant of the privilege was the benefit to the public from the erection of the mill. But, if this benefit ceases for eighty or one hundred years, so should the privilege also, and if it ceases for a moment, it is gone for ever; I should say, that if the dam was down for forty years, the privilege would be gone. Indeed, if the consideration for the grant of this privilege were the benefit to be derived from the mill by the public, the privilege would be abandoned as soon as the operations of the mill were permanently abandoned.

There is but one other privilege to which the testator could have alluded. *John Bethell* the younger, owned the one hundred acre patent, and devised it to his wife *Rose*, under whom the testator derived title. *Rose* had sold a part of the one hundred acres with power to flood the rest. She had no power, however, to authorise her grantee to flood land not her own; consequently, a devise of part of the land derived from her with the rights appurtenant to it, when it came into the devisor's hands, can give no greater right than was in the grantor from whom he acquired it.

From no other part of the will can I discover any thing like a privilege to flood the plaintiff's land. The devise of the residue does not carry it, for such a right is no part of the residue.

You are to give the actual damages—these are exceedingly small, according to the evidence of all the witnesses. Two hundred dollars, it is said, would pay all damages past, present, or to come—you can compensate none but what have already been suffered, and these appear to be little more than nominal.

The defendant's counsel filed the following reasons, in support of their motion for a new trial, in the Circuit court:

*First.* That the court erred in charging the jury; that where no mention has been made of the existence of the saw mill for more than fifty years, the law presumed an abandonment of a previous vested right to erect such mill, and a dam to supply the same; and that such presumption was so strong, that the law drew the conclusion,

(Nitzell v. Paschall.)

let the fact be as it may, and the jury were bound to find accord-ingly.

*Second.* That under the patent given in evidence in this case, dat-ed the 18th of the 6th month, 1689, there was failure of the consi-deration of the grant, so soon as the mill went down; and that there-by the grantees in the said patent, and those claiming under them, gave up their privilege, and forfeited all rights derived under the same.

*Third.* That under the will of *John Paschall,* and the devises therein to his son *Henry,* there was no right given, either directly or indirectly, to him, to use the privilege attached to the four acres of " the saw mill land," for erecting or maintaining a dam, and flooding back the water.

*Wm. T. Smith* and *Tilghman* for the appellant cited *Angell on Ad-verse Enjoyment,* 23. 76. 89.   6 *Com. Dig.* 79.   *Presumption, E.* 2. *Act of* 26th *March,* 1785.   *Purd. Dig.* 532.   *White* v. *Crawford,* 10 *Mass. Rep.* 181.   *Butz* v. *Ihrie,* 1 *Rawle,* 218.   *Richard* v. *Williams,* 7 *Wheat.* 59.   3 *Starkie on Evid.* 1235.   1 *Proud's Hist. of Penn.* 110. 116. 123. (*note.*)   *Blaine* v. *Chambers,* 1 *Serg. & Rawle,* 169. 2 *Bl. Com.* 155.   *Lithell's Case,* 4 *Co. Rep.* 86.

*Dick* and *S. Edwards,* for the appellee, cited *Cluggage* v. *Duncan,* 1 *Serg. & Rawle,* 120.   *Angell. on Adv. Enjoyment,* 92. 109, 110.

The opinion of the court was delivered by

Gibson, C. J.—The foundation of the licence mainly relied on at the trial, was a supposed grant in the patent of 1689.   The patent was issued to twenty-four grantees " for the use of a mill ;" and hence, as the land granted did not afford a sufficient water power for the pur-poses of the mill, which it appears was even then erected, it is supposed that this designation of the object in view, amounted by necessary implication to a grant of any additional power that was at the dispo-sal of the proprietary.   It might admit of a question, whether a grant by one, who acted in the capacity of a sovereign, could be ex-tended by implication, without proof of knowledge, that such exten-sion would be absolutely necessary to carry the main design into effect.   Again, it seems the patent was not issued as evidence of an original grant, but to confirm the grantees in possessions guarrantied to them in the act of cession by which the *Swedish* colony passed to the *British* crown.   If so, the grantees held by title paramount; and if the lands of the plaintiff were held by the same species of title, as is altogether probable from the circumstance that it lay in the heart of the *Swedish* settlement, and contiguous to what was called the governor's palace on *Tinicum* Island, it could not be affected by any grant or reservation of the proprietary, as either would be in deroga-tion of the treaty.   The inclination of my mind, however, happened to be in favour of supporting the implication of a grant strengthened, as it seemed to be, by a long, and at one time an uninterrupted pos-session and use of the right.   But evidence having been given of a

subsequent *non user* for at least thirty-eight years, I directed the jury, that in the absence of proof to the contrary, the law raised a presumption, which they were bound to adopt, let their actual belief be what it might, that the right had been released or extinguished in some other lawful mode: and of the solidity of this also, without intending to intimate an opinion either way, I am inclined to doubt. It is certainly true that a right of enjoyment may be lost in the same way it has been gained, and when acquired by an adverse possession for twenty years, it may, I should suppose, be lost by *non user* for the same period. Where, however, it has been acquired by grant, it will not be lost by *non user* in analogy to the statute of limitations, unless there were a denial of the title or other act on the adverse part to quicken the owner in the assertion of his right: and this much was decided in *Butz* v. *Ihrie*, (1 *Rawle*, 218.) I think there cannot be a doubt, but that lapse of time may be so great as to afford a *natural* presumption without aid borrowed by analogy from the statute of limitations. The question was, however, whether mere *non user* for *any* length of time without any disaffirmance of the right on the adverse part, were sufficient to found an *artificial* presumption, or could operate in any other way than as evidence to be left to the jury for what it might seem to them to be actually worth. Happily, the decision of this question is superceded by a new state of the case produced by the effect of the will to which, at the trial, I did not sufficiently advert. The testator was at the time of his death, the owner in whole or in part of four contiguous tracts of land, which are in part, bounded by the water course in question. Of these, one is now owned by the plaintiff, and another by the defendant. To the latter was devised the testator's undivided moiety of certain four acres called " the saw mill land," " together with all the *rights* and *privileges* thereunto appertaining." Now independently of the testator's power to burthen, at pleasure, particular parts of his estate with easements or privileges in favour of devisees of the other parts, it is to be remarked, that this undivided moiety of the four acres had come to him with a privilege appertaining to it, and created either by an implied grant in the patent, or at least by long adverse possession, of swelling the water back certainly to the mouth of what is called middle run; and this as a privilege appurtenant is expressly devised to the defendant. I am aware that there was another privilege appurtenant of butting a dam on the opposite shore, which might be sufficient to satisfy the words of the devise; but the construction we have adopted seems to be in furtherance of the plain and obvious general intent of the will, in favour of which particular expressions ought to be liberally expounded. The devise of the appurtenances to the saw mill tract, then, is an express devise of a right to swell the water as high as the mouth of Middle Run, which is the lowest and southernmost boundary of the plaintiff's land. But in addition, the testator devises to the defendant a right to erect a dam at any point between the plaintiff's land, then devised to the testator's son

(Nitzell *v.* Paschall.)

*Benjamin,* and the land on the eastern side of the creek, devised to his son *John ;* with the further right to dig a race through *John's* land.    Is not this substantially a devise of the remaining part of the water power ; and does it not, in conjunction with the devise of the privileges appurtenant to the saw mill tract which were never severed from it by the testator, pass all the property in the water course, which was subject to his control ?    Although the words, taken strictly, import nothing more than a right to erect a dam, the subject of the devise is the water power ; the authority to erect a dam on the land not belonging to the devisee, having regard only to the mode of enjoyment, which could not have been in this way, unless the privilege could not have been exercised by means of a dam erected on the devisee's own land.    In *Butz* v. *Ihrie,* already cited, where there was a reservation in a conveyance of a right to swell the water by means of " a dam," it was held that the substance of the reservation was the right to overflow ; and whether this were done by one dam or more, was unessential, so that the mode of enjoyment being merely directory, could not abridge the extent of the right.    Now it is impossible not to perceive that the leading intention of the testator here was to attach to the saw mill tract all the power which the water course afforded, and this with the most extended means of enjoyment, which it was in his power to confer, inasmuch as the power being barely sufficient for a mill at the lowest point of the water course within his boundary, would have been altogether worthless, had it been distributed among the different parts of his estate.    The intention then being clear, and the words being sufficient to pass the right, it results that a licence sufficient for all the purpose of defence was created by the will ; against which, having been partly put in use by the erection of what is now *Passmore's* dam, there can be no presumption from lapse of time, of any release or extinguishment whatever ; and I ought to have so instructed the jury.

Judgment reversed, and a new trial awarded.