Dill *v.* Board of Education of Camden.

ANNIE F. DILL and another

*v.*

THE BOARD OF EDUCATION OF THE CITY OF CAMDEN and
JOHN CORBITT.

1. Where the owner of land makes a map of it, showing a street upon it, and sells lots abutting upon and calling for such street, but the same is never used or accepted by the public, the purchasers, nevertheless, acquire the same

rights in the street so called for as against the original owner and each other as they would if it were in fact a public street.

2. The rights so acquired are private rights annexed as appurtenant to the lots so conveyed, and are distinct from, and in addition to, the rights of the owners as citizens to use the street after it shall be, if ever it is, used and accepted by the public.

3. The rights so acquired and annexed to the abutting lots are two fold— *first,* the right of access to and from and passage over the land so designated as a street; and, *second,* the right to light, air and prospect from and over it. These rights are distinct from each other, and the second is capable of being exercised and enjoyed by itself and without any exercise or enjoyment of the first.

4. Mere non-user for any length of time of an easement created by express grant will not destroy or extinguish it. In order to extinguish it by non-user, there must be some conduct on the part of the owner of the servient tenement adverse to, and in defiance of, the easement, and the non-user must be the result of it, and must continue for twenty years.

5. The owner of a block of land made a map of it, showing an alley or street twenty feet wide running through it, and, by deeds executed and delivered on the same day, conveyed to two several grantees the lots situate on each side of the alley and facing on one of the main streets, and in the deeds called for the alley. The grantee of one of the lots so conveyed enclosed his lot with an ordinary fence, and included in his enclosure the strip designated as an alley, and maintained the enclosure for more than twenty years, but did not place upon the part designated as an alley any structure except the fence.—*Held,* (1) that the owner of the lot adjoining the *locus* of the alley on the opposite side had a right of light, air and prospect from and over the *locus* of the alley which was not extinguished by its enclosure for more than twenty years, and (2) that equity would, at the suit of the last-named owner, restrain the erection upon the *locus* of the alley of any structure which will obstruct the exercise of such right to any greater extent than did the fence so maintained for more than twenty years.

Heard on bill, answer and proofs.

*Messrs. Thomas B. Harned* and *Charles Van Dyke Joline,* for the complainants.

*Messrs. William H. Jess* and *Samuel W. Beldon,* for the defendants.

PITNEY, V. C.

The complainants (mother and daughter, the latter an infant) are the owners of a house and lot situate on the south side of

Chestnut street, in the city of Camden, about forty-five feet east of Newton avenue, and ask the court to enjoin the defendants from erecting a school-house on land immediately adjoining their lot on the west.

The defendants are the Board of Education of the City of Camden, and, as such, have jurisdiction over, and charge of, all the public school buildings and grounds in said city, and have contracted to build, and before the interposition of the court herein were about to erect, a large school building in the position mentioned, which, if erected, would almost touch the westerly line of the complainants' lot, and would be in close proximity to the dwelling standing thereon.

The allegation and claim of the complainants is, that the place where the building is to be erected is a public street in the city of Camden, and that they have the right to have it kept open and free from obstruction, as well for purposes of access to and from their lot as also for light, air and ventilation.

The question litigated was, whether or not the place in question is at this time, or ever has been, a public street; or, if not a public street in fact, whether or not the complainants have not in it the same rights as if it were a public street.

Both parties claim title to their several holdings under Sarah Kaighn, who became seized of an undivided interest in the entire block of land of which the premises in question are a part, upon the death of her father, James Kaighn. Some time prior to the year 1812, he seems to have died seized of a large tract of land in that neighborhood, which, shortly after his death, was laid out into streets and called Kaighnton, and in 1812 was partitioned among his children, and in that partition the block in question, bounded north by Chestnut street, east by Broadway, south by Kaighn's avenue and west by Fourth street, was allotted to Sarah Kaighn. This block was bisected diagonally by a street called Newton avenue, running northeast and southwest, and it is the part east of Newton avenue with which we have to do. This part was again, during Sarah Kaighn's ownership, bisected by an alley or street, twenty feet wide, running east and west, called Sycamore street, now in use, and about the location of which there

is no dispute.  The part north of Sycamore street was again bisected by an alley or street, twenty feet wide, running north and south, which has never been wholly opened to the public, or, if ever opened, has not been kept open and used as a street, and the true location of which was one of the matters in dispute at the hearing.

The recorded deeds from Sarah Kaighn for portions of the north part of the block in question indicate and tend to prove that it was at some time laid out into lots on a map, with the alleys in question plotted upon it, but it was admitted at the hearing that no copy of such map could now be found.  It is clear that, some time prior to 1819, so much of the block in question as lies north of Sycamore street was divided, on paper, into eight lots, seven of which had a frontage of forty feet each on Broadway, and numbered, commencing with Sycamore street, 13, 14, 15, 16, 17, 18 and 19, which last was on the corner of Broadway and Chestnut street, and the eighth, numbered 20, is the lot now owned by the defendants.

The defendants produce a certified copy of the record of a deed, dated May 20th, 1819, made by Sarah Kaighn to John Hopple, by which she conveys to him as follows:

"The four following described lots of ground situate in the Kaighnton aforesaid designated Sarah Kaighn's square No. 7, *and marked in the plan thereof* Nos. 13, 14, 15 and 16, bounded *southward* by a *twenty feet wide alley, westward* by *other ground of* said Sarah Kaighn, northward by lot No. 17, and eastward by the Woodbury road [Broadway], leading from thence to Cooper's ferries, containing in breadth, north and south, one hundred and sixty feet, making four lots each forty feet front on said road, and in length, east and west, one hundred and eighty feet, with ingress, egress and regress to and along the said alley and all the lanes &c. belonging to Kaighnton."

It will be observed that in this deed there is no mention of a lane or alley on the west side of these four lots.

Under the date of the 8th of March, 1821, Sarah Kaighn made a deed to Joseph, John and John M. Kaighn, Joseph Boggs and Joseph B. Cooper, five persons, as trustees, of a portion of this block, described as follows:

"All that lot of ground No. 20, situate in Kaighnton aforesaid on *subdivision* of Sarah Kaighn square No. 1, beginning at the angle of a twenty feet wide alley and the Cooper Creek road [now known as Newton avenue]; thence by the north side of said alley [now known as Sycamore street] eastward to the corner of another twenty feet wide alley [the alley in dispute]; thence northward by the west side of said alley to the south side of Chestnut street [*sic*] till it intersects the eastward line of said road [Newton avenue]; thence south-westerly by said road to the place of beginning."

There is a plain hiatus in this description, and there should be interpolated after the words "Chestnut street" these words, "*thence westwardly along Chestnut street.*"

It will be observed that no distances are given in this description.

The deed declared that the grantees should hold the premises in trust for the purposes of permitting the freeholders of the town of Kaighnton to erect upon the lot conveyed a school-house and other buildings necessary and proper for the maintenance of a school &c., and that the building so to be erected shall be used to keep open a school forever.

Upon this lot, in 1856, the school authorities erected a school-house, which has been maintained ever since; and the one now proposed to be erected is located between such school-house and Chestnut street.

Under the date of the 10th of March, 1821, two days after the making of the school-lot deed, Sarah Kaighn made separate deeds to her brother, Joseph Kaighn, for lots Nos. 18 and 19 in that subdivision, which, though dated two days later than the school-lot deed, were in fact acknowledged and delivered on the same day as that deed. The description of lot No. 19 in its deed is as follows:

"Beginning at the corner of the road called Broadway and Chestnut street in Kaighnton aforesaid; thence westward by Chestnut street two hundred feet to a *twenty feet wide alley;* thence *southward by said alley* forty feet to the corner of lot No. 18; thence eastwardly by said lot two hundred feet to Broadway" &c., "*marked in the plan of Sarah Kaighn's square* No. 1, No. 19, * * * *with ingress, egress and regress to and along Broadway and said alley and all the streets, lanes, alleys and passages belonging to Kaighnton aforesaid.*"

The deed for lot No. 18 calls for the alley on the west end, and the same language is used.

The reference in these deeds to a plan containing subdivisions of Sarah Kaighn's share in her father's estate seems to establish the actual existence of the map.

It will be observed that in these deeds, namely, that for the school lot and those for lots Nos. 18 and 19, is found the first mention of the alley in question, running north and south from Chestnut street to what is now known as Sycamore street; and as no distances along the streets are given in the deed for the school lot, it seems to me that the distance of two hundred feet, from Broadway along Chestnut street, given in the deeds for lots Nos. 18 and 19, must, as. *between the parties* to' the conveyances of March, 1821, conclusively locate that alley as commencing at Chestnut street, with its easterly side two hundred feet west of Broadway. And this was finally, in substance, conceded by the defendants at the hearing; although the laying out of the lots lying south of Nos. 18 and 19, with a depth from Broadway of only one hundred and eighty feet, would seem to indicate that Miss Kaighn at one time contemplated the locating of the alley twenty feet farther east, and although in point of fact there has, for many years, been an alley running northwardly from Sycamore street about half way through to Chestnut street in accordance with this latter plan.

In 1823 Joseph Kaighn, the grantee of lots Nos. 18 and 19, conveyed them to Joseph Boggs for a valuable consideration, using the same description calling for the alley as had been used in the two deeds from Sarah Kaighn to him of March 10th, 1821, and referring to that deed. And it will be here observed that both Joseph Kaighn and Joseph Boggs were trustees in the school-lot deed.

Joseph Boggs died (just when does not appear), and his heirs, in 1843, thirteen years before the school-house was built, subdivided lots 18 and 19 (which, it will be remembered, had, when combined, a frontage of eighty feet on Broadway and two hundred feet on Chestnut street), which subdivision is shown on a map made by the counsel of both sides and exhibited for both

parties at the hearing. By that subdivision they divided the two lots in question, Nos. 18 and 19, first into two parts, making two lots one hundred feet front each on Chestnut street; and the westward half of these two lots they again divided into four lots of twenty-five feet front each on Chestnut street and eighty feet deep. The most westward of these lots—the one nearest the school lot, being lot No. 10 in the Boggs subdivision—was conveyed by deed of April 4th, 1843, to Francis Boggs by his brothers and sisters, and is therein described as follows: . ·

"Beginning at the *north west* corner of a twenty feet wide alley and Chestnut street, in the city of Camden; thence eastward twenty-five feet to the corner of lot No. 11; thence southward by lot No. 11 eighty feet to the corner of lot No. 11; thence westward twenty five feet to a corner in the line of *vacant land;* thence north, and parallel with said alley, eighty feet to the place of beginning."

This description is somewhat blind. The call for the *north west* corner of the alley and Chestnut street, as I construe the words "north west," was an impossible call. There was no such corner. The course of Chestnut street was nearly due east and west, and the alley was situate wholly to the south of it. If the word "north" is omitted, and we construe the call to be for the west corner of Chestnut street and the alley, we include the alley in the lot conveyed, which seems an unreasonable result. It is also difficult to understand why the word *"parallel"* was predicated of a line which was coincident with one side of the alley, whether we locate it one hundred and eighty or two hundred feet west of Broadway. These peculiarities in the description of the deed to Francis Boggs do not, however, seem to me sufficient to shake the result I have arrived at as to the location of the alley in question.    .    . .

Francis Boggs conveyed this lot (together with lot No. 11) to Adam R. Dill, by deed dated August 25th, 1866, using the same description, except that it commences at the "southeast" corner of a twenty feet alley and Chestnut street; and, shortly after, Dill built a dwelling upon it, the westerly side of which stands about five feet from the westerly line of the lot.    :

The foregoing stated deeds comprise the paper title of the parties to the *locus*. No other conveyance was made by Miss Kaighn affecting it. Adam R. Dill devised the lots to the complainants.

Before the year 1856, when the school authorities erected the school-house, the school-house lot had never been enclosed, but had laid open to common with the alley, being covered with brush and briars, and crossed in all directions by all persons at their pleasure. At or shortly after the erection of the school-house, the trustees enclosed the lot surrounding it, including the alley, by a common board fence six or eight feet high on all sides, and have kept it enclosed ever since. The part of it covered by the alley called for in the deeds has not been built upon, and the only use made of it has been for a play-ground for the school boys. The true original location of the easterly fence, or " back fence " as it was called at the hearing, of this enclosure was the only question of fact which was seriously litigated at the hearing. The defendants contended that this fence was erected in 1856 in its present location, which is two hundred and three feet west of Broadway, measured along Chestnut street, and included nearly all the *locus* of the alley, and that it has been maintained in that position ever since. The complainants contended that it was at first, and for many years, and until within twenty years, located at the northerly end, twenty feet further west, and that there was a free passage along it from Chestnut street to Sycamore street up to a period within twenty years.

I do not deem it necessary to discuss the evidence at length, and content myself with saying, that I think the decided weight of it is with the defendants; and I am satisfied that the fence has stood in its present position for nearly thirty-four years.

Being satisfied that the fence has been in its present position for at least thirty-three years, I must hold that the defendants are entitled to the benefit in law of such enclosure for that period of time.

No disability on the part of any owner of complainants' lot is alleged until the death of Adam R. Dill, which occurred in February, 1889.

Two questions arise upon this state of facts: *First*, what rights in the alley arose to the owner of complainants' lot out of the language used in the several deeds of March 8th and 10th, 1821 ? *Second*, what is the effect upon those rights of the enclosure of the alley by the school authorities and its use as a play-ground by the school children ?

With regard to the first question, I think it clear, in the first place, that the effect of the deeds was to carry the title to each of the grantees of the deeds just named to the centre of the alley. There is no difference in principle in this respect between the use of the word "alley" and the word "street." It was so held in *Freeman* v. *Sayre, 19 Vr. 37*, and, in addition to the cases there cited, in *Wiggins* v. *McCleary, 49 N. Y. 346*.

In the next place, the effect of the several deeds in question was to create a mutual estoppel between the parties—the trustees of the school lot on the one part and the grantee of complainants' lot on the other, each against the other—and in favor of both as against Sarah Kaighn, to deny that the alley in question existed.

Moreover, the use made of the word "alley" in the other conveyances, the extension through the entire block of that now known as Sycamore street, and the description of the one in question as extending from Chestnut street to Sycamore street, shows conclusively that it was intended to be and have all the attributes of a public street.

Upon the principal proposition, I cite *Washb. Easem. *170 et seq.*, and *Godd. Easem. (Perk. ed.) 264 et seq.* and the cases there cited. And further, *Roberts* v. *Karr, 1 Taunt. 495*, where Chief-Justice Mansfield says: "If you (the lessor) have told me in your lease that this piece of land abuts on the road, you cannot be allowed to say that the land on which it abuts is not the road."

Also, *Espley* v. *Wilkes, L. R. (7 Exch.) 298*, where (at *p. 303*) *Roberts* v. *Karr* is cited with approval. In the later case the land conveyed was described as abutting on "newly-made streets," and the chief-baron (*p. 304*) says: "Here the land is described as abutting upon 'newly-made streets,' and the case is an authority to show that the grantor is estopped from denying

that the strips of land, his property, are what he describes them to be, that is to say, 'streets,' which they cannot be unless there be a way through and along them."

I further cite *Parker* v. *Smith, 17 Mass. 413,* and *O'Linda* v. *Lothrop, 21 Pick. 292.* In this case land was sold bounded on an intended street, and (at *p. 296*) the court say : "As the purchasers of the estates on each side of the *locus in quo* did not acquire a right to the soil itself [holding a different rule in this respect from that prevailing here], it remains to be seen whether they acquired an easement over it. There was no express grant of a right of way. Nor did any way pass as appurtenant to the land granted, none being in use or in existence. If the defendant acquired an easement in the land, it must have been by implication, or on the principle of estoppel. The doctrine laid down in *Parker* v. *Smith, 17 Mass. 413,* seems to us to be a very reasonable and equitable one. That case, we think, was perfectly analogous to this; but, if there be any difference, this is the stronger of the two. It was there said, that 'the grantor and his heirs are estopped from denying that there is a street or way to the extent of the land on those two sides. We consider this to be not merely a description, but an implied covenant that there are such streets.' This opinion is decisive of this part of the case."

The question was thoroughly discussed and the principle established in the case of *Child* v. *Chappell, 9 N. Y. 246.* The opinion of Morse, J. (*p. 257*), seems to me to state the doctrine clearly, and truly, and I adopt it : " Where an owner of land lays it out in lots and streets, and exhibits the streets upon a map by which he sells and conveys lots so laid out, as between him and the purchasers of such lots, the spaces so laid down upon the map as streets are dedicated as such to the public use. This I understand to be the law, and in conformity to the principles of natural justice. The mere act of selling and conveying by such a map binds the grantor to permit the land so laid down as streets to be used as such. *As between the parties, their heirs and assigns, it fixes the servitude of a public way upon the land thus laid out as streets.* It is perhaps unnecessary now to consider

Dill v. Board of Education of Camden.

whether such a grant as between the grantor and the public would be a dedication.   *   *   *   The transaction is, however, in the first instance, strictly a private one as relates to the streets, as much as it is a private one as relates to the land actually conveyed. The right to use, and to have used by the public, the streets laid down upon the map, has become an appurtenance to the parcel of land granted. And the same right belongs to each of the parcels granted upon the same terms. As between the original owner of the land and the several grantees of parcels thereof, these rights are fixed, but until the public has in some way become a party to the transaction, the whole arrangement is subject to be rescinded by the joint act of the original owner and of all those who own and have the right to represent the land sold. The principle established is, that an owner of land may make any lawful disposition of it which he deems most beneficial. He may found a city, a village, or an agricultural or manufacturing community at his own free will, so far as the appropriation of his land may go to effect such purposes. He may adopt just such measures concerning his land as to his judgment may seem expedient. I suppose it would nowhere be doubted that a man owning a hundred acres of land through which there ran no highway would be at liberty to enclose it with a wall, and to erect a fenced town. He might lay out streets throughout the entire parcel, and collect a phalanx of socialists, having all the streets common and, as among themselves, public; as to the world beside exclusive and private. In other words, there might be impressed upon this mass of private property, by private contract, rights, in the strictest sense of the word, analogous to the ordinary public rights of highway, and yet these rights confined to the owners and representatives of the land forming the subject of the compact, and liable to be ended and rescinded by the mutual consent of all who have an interest in the subject."

In this state the same doctrine was announced in *Att'y-General* v. *The Morris and Essex R. R. Co.*, *4 C. E. Gr. 386* (at *pp. 391, 392, 394*), and, although the decree in that case was reversed on appeal, the statement of doctrine referred to was not disturbed. It was reiterated by the court of errors and appeals, in terms still more

clear and strong, in *Booraem* v. *Railroad Co., 13 Stew. Eq. 557*. In that case the complainant sought to restrain the defendant from building a railway across lands sold by her to defendant for that purpose in such a manner as to obstruct a street not yet constructed, which was reserved in the conveyance in these words :

" Together with all the right, title and interest of the said party of the first part to the lands covered by Ogden and Palisade avenues in front of the lands above described, subject to the easement of said avenues respectively; it being understood that Ogden avenue is extended for the same width across said premises and dedicated as a public highway."

In discussing the rights of the complainant in this street, the court says : " The extension of Ogden avenue across the premises was obviously intended by the parties to afford means of access to the complainant's remaining lands from the present termination of the avenue, and the language used in the deed is such as is uniformly recognized as sufficient to create an easement of a right of way *inter partes* by way of implied grant. Nor do the additional words with regard to the extension of the avenue being dedicated as a public highway impair the legal effect of the language of the deed as an implied grant of an easement. The creation of a public right to be enjoyed *in futuro*, whenever the public authorities shall see fit to adopt the extension of the avenue as a public highway, is not inconsistent with the private easement which enured to the grantee immediately from the grant. Indeed, whenever a dedication as a public highway is effected—as it usually is—by means of conveyances to private persons by reference to a proposed street over other lands of the grantor, the private rights of the several grantees precede the public right, and are the source from which the public right springs. By such conveyances the grantees are regarded as purchasers by implied covenant of the right to the use of the street, as a means of passage to and from their premises, as appurtenant to the premises granted, and this private right of way in the grantees is wholly distinct from, and independent of, the right of passage to be acquired by the public."

Dill v. Board of Education of Camden.

I should have thought this doctrine so thoroughly settled as to require no support by citation of authority, but for the case of *Hopkinson* v. *McKnight, 2 Vr. 422*, cited and relied upon by the defendants' counsel. It is enough to say of that case that it is clearly distinguishable from the one in hand, and, so far as it conflicts with the doctrine now in question, has been, in effect, overruled by the case of *Booraem* v. *Railroad Co*.

The right to have the alley, thus described, forever preserved as a street, is a private right annexed as an appurtenant to the ownership of the land conveyed, and is entirely distinct from, and in addition to, the right of the owner as a citizen at large to use the street after it should become a public street by acceptance by the public authorities. But while it is a private right, it is, in my judgment, co-extensive with the public right just mentioned, in that it goes the length of requiring that the alley should be preserved in all respects as if it were actually a public street. As between the parties against whom the estoppel acts, it has all the attributes of a public street, though never in fact accepted by the public.

If we inquire what those rights are, we find that they are two fold—*first*, a right of access from the abutting property, and a passage to and fro over it in all its extent; and, *second*, a right of light, air, prospect and ventilation. These rights are quite distinct from each other and capable of being separately exercised and enjoyed. The right of light and air and ventilation may be enjoyed fully without the least exercise of the right of access and passage.

That this right of light, air, prospect and ventilation exists is clearly established by the authorities of this and other states. It was clearly defined and established by the court of errors and appeals in this state in *Barnett* v. *Johnson, 2 McCart. 481*. And its application in that case to the case of a canal is an apt illustration of the distinctness of such right from that of access to, and passage over, the highway on the servient tenement. The court in that case says: "There are, it appears to me, two classes of rights, originating in necessity and in the exigencies of human affairs, springing up coeval with every public highway, and which

28

are recognized and enforced by the common law of all civilized nations. The first relates to the public passage; the second, subordinate to the first, but equally perfect and scarcely less important, relates to the adjoining owners. Among the latter is that of receiving from the public highway light and air.

" In the first place, has not the adjacent owner upon the '*alta regis via*'—the ordinary public highway—of common right the privilege of receiving from it light and air? Universal usage is common law. What has this been? Men do not first build cities, and then lay out roads through them, but they first lay out roads, and then cities spring up along their lines. As a matter of fact and history, have not all villages, towns and cities in this country, and in all others, now and at all times past, been built up upon this assumed right of adjacency? Is not every window and every door in every house in every city, town and village the assertion and maintenance of this right?

" When people build upon the public highway, do they inquire or care who owns the fee of the road-bed? Do they act, or rely upon any other consideration except that it is a public highway, and they the adjacent owners? Is not this a right of universal exercise and acknowledgment in all times and in all countries, a right of necessity, without which cities could not have been built, and without the enforcement of which they would soon become tenantless?"

The same doctrine has been established, after fierce and protracted litigation, in New York in the elevated railway cases. *Story* v. *Railroad Co., 90 N. Y. 122; Lahr* v. *Metropolitan Ry. Co., 104 N. Y. 268.* Chief-Justice Ruger (at *pp. 288, 289*), in stating the result of the authorities, says: "That abutters upon a public street claiming title to their premises by grant from the municipal authorities, which contains a covenant that a street be laid out in front of such property, acquire an easement in the bed of the street for ingress and egress to and from their premises, and also for the free and uninterrupted passage and circulation of light and air through and over such street for the benefit of property situated thereon. That the erection of an elevated railroad, the use of which is intended to

Dill *v*. Board of Education of Camden.

be permanent, in a public street, and upon which cars are propelled by steam engines, generating gas, steam and smoke, and distributing in the air cinders, dust, ashes and other noxious and deleterious substances, and interrupting the free passage of light and air to and from adjoining premises, constitutes a taking of the easement, and its appropriation by the railroad corporation, rendering it liable to the abutters for the damages occasioned by such taking." And further (at *p. 291*): "An abutting owner necessarily enjoys certain advantages from the existence of an open street adjoining his property, which belong to him by reason of its location, and are not enjoyed by the general public, such as the right of free access to his premises, and the free admission and circulation of light and air to, and through his property.

This right of light, air and ventilation is property, and its owner is entitled to its preservation and enjoyment.

In *Barnett* v. *Johnson* an injunction was issued restraining the defendant from erecting, under license from the canal company, a building over the canal and adjoining plaintiff's land. And in the elevated railroad cases immense sums of money have been paid to property-owners fronting on the streets for obstructions to light and air caused by that structure.

It remains to inquire as to the effect, in the case in hand, upon these rights of the enclosure of the alley as a part of the playground. The complainants' counsel take the ground that the right in this alley was a public right, that it was preserved to the public, and through the public to the complainants, by the application of the maxim that "Time does not run against the state." *Cross* v. *Morristown, 3 C. E. Gr. 305; Hoboken Land Co.* v. *Hoboken, 7 Vr. 540.*

I do not think the complainants can avail themselves of that staff. The maxim can be invoked only by the state for the preservation of a public right, and the complainants rights are, as already shown, strictly private. The complainants must stand upon their private rights alone.

It is well settled that mere non-user for any length of time, no matter how long, will not destroy or extinguish an easement arising, as here, out of express grant, as distinguished from one

arising out of long adverse user. In order to destroy the ease-
ment by non-user, there must, in addition, be some conduct on
the part of the owner of the servient tenement adverse to, and
defiant of, the easement, and the non-user must be the result of
it. In short, it must amount to an acquiescence of twenty years
in acts of the owner of the servient tenement, hostile to and in-
tended to prevent it. This was held in substance in *Horner* v.
*Stillwell, 6 Vr. 307* (at *pp. 313, 314*); *Johnston* v. *Hyde, 6 Stew.
Eq. 632* (at *p. 642*); and in *Riehle* v. *Heulings, 11 Stew. Eq. 20*,
by Chancellor Runyon, whose decree was affirmed by the court
of errors and appeals for the reasons given by him. He says (at
*p. 23*): "A right of way cannot be released, abandoned or sur-
rendered by a mere parol agreement. The right in this case is
the privilege of the use of a lane or passage-way of twelve feet
wide. It was granted in connection with the conveyance of the
lot—by the same deed—for use in connection with the lot, and for
the convenience of the owners thereof; and the grant was to them,
their heirs and assigns, forever. If the fact were that the land
or passage-way has not been used for the last twenty-seven years,
except by express permission from the defendant or his father, it
would not bar the complainant from a right to relief. The right
in question exists by grant, and non-user alone will not forfeit or
extinguish it."

And see *Arnold* v. *Stevens, 24 Pick. 106*, and *Owen* v. *Field,
102 Mass. 112*. Ames, J. (at *p. 114*), says: "As to the alleged
forfeiture of her right to make use of the two springs recently
taken into the aqueduct, it is to be remembered that she claims
by deed, and for that reason mere non-user would be of no avail
to impair or defeat her right. The non-user, to have that effect,
must be in consequence of something which is adverse to the user.
Nothing short of adverse use, on the part of the owner of the ser-
vient estate, *inconsistent with and preventing the use* of the ease-
ment, can destroy the easement."

*Barnes* v. *Lloyd, 112 Mass. 224*. In this case the defendant
claimed a right of way from the highway to his land over the
intervening land of the plaintiff. The owner of both lots had
conveyed defendant's lot to his grantor in 1800, with the express

grant of a right of way across the lot retained, and had subsequently conveyed it to the plaintiff's grantor, reserving a right of way in favor of defendant's lot, which reservation had been inserted in all subsequent conveyances of plaintiff's lot down to 1859. Prior to 1870, being a period of seventy years from the creation of the right and twenty years from its last recognition by the owner of the servient tenement, no use whatever of the right of way had been made by the successive owners of the defendant's lot, and plaintiff's lot had always been kept fenced, both on its road side and on the line with defendant's lot, and also across the middle, by fences without any gate-way, or barway, or other opening, and the lot itself had been continuously cultivated. The jury found, nevertheless, that there had not been such adverse use as to extinguish the easement, and the court held that mere non-user, under the circumstances, did not extinguish it.

*Ward* v. *Ward, 7 Exch. 838,* is to the same effect. And see *Jewett* v. *Jewett, 16 Barb. 150* (at *p. 157*); *Smyles* v. *Hastings, 22 N. Y. 217* (at *p. 224*); *Butz* v. *Ihrie, 1 Rawle 218,* and *Nitzell* v. *Paschall, 3 Rawle 76.* Chief-Justice Gibson (at *p. 81*) says: "Where, however, it has been acquired by grant, it will not be lost by *non-user* in analogy to the statute of limitations, unless there were a denial of the title, or other act on the adverse part to quicken the owner in the assertion of his right."

This brings us to consider the character of the adverse user in this case. It consists wholly of the fence along, or near to, the line of the alley next complainants' lot. The object of the fence was to enclose a play-ground for the children attending the school, and it is quite natural to infer that its object was as much to keep the children within its bounds as to exclude the neighbors from them. The use made of the ground was a *quasi* public use, and was not, as it seems to me, necessarily hostile to access and passage by the adjoining owner. Such must have been the rule acted upon in *Barnes* v. *Lloyd, supra.*

But I do not deem it necessary to decide in this case whether complainants' right of passage over the *locus in quo* has been lost or not; since, in my judgment, the right to the relief asked

for does not depend upon it. The serious question is, whether the enclosure in question was adverse to, and in defiance of, complainants' right of light, air and ventilation.

Defendants contend that the latter right was a mere incident of the right of way, and must stand or fall with it.

For the reasons already stated, I cannot adopt that view. The enjoyment of light, air and prospect over the *locus* could be, and in fact was, enjoyed to its fullest extent without ever placing a foot upon it.

They further contend that, according to the authorities, the right of light, air and ventilation is only appurtenant to a strictly public street. But I have already shown that, as between the parties, this piece of ground must be considered, in all respects, as if it were in fact a public street. And, moreover, the right in question is one exercisable, and frequently exercised, over lands in which the public has no interest.

It was further contended, that the enclosure of the *locus* by the school authorities was an act of supreme dominion and an assertion of defendants' title exclusive of all rights of every nature in other parties, and was, in effect, notice to the owners of complainants' lot of such assertion. But I cannot so consider it, and do not think the owner of complainants' lot was called upon to so construe it. The enclosure of the *locus* interfered in a very slight degree, if at all, with the exercise of the easement in question, and the familiar rule is—and it is applicable here—that the extent of the right acquired by adverse use is the extent of the actual user.

Then it is impossible to eliminate from the problem the object of the enclosure as well as the location of the first building within it. The school lot as enclosed is, in shape, the southeast half of a square bisected by a line running diagonally across it from northeast to southwest, with a part of the northerly point cut off. Newton avenue ran by the longer side of it, and the school-house faces this avenue and is about in the middle of the lot. The ground at the sides and rear is used as a play-ground. Now, a considerable space of open ground around a school-house is usual and, I may add, is almost a necessity, so that one would

hardly expect a school-house to be erected without suitable grounds surrounding it. In this instance the space left around the present school-house does not seem too large for that purpose. Looking at a map of these premises as they have existed since 1856, and observing the size of the ground enclosed, I think one would hardly suspect that the school authorities would ever desire to occupy any part of it for any additional building for school purposes. The southwest end of the proposed new building will reach within ten feet of the old one; its front will be only eight feet distant from the sidewalk of Newton avenue, and its northeast end will almost touch the line of complainants' lot, leaving an unusually small amount of open ground around it. I do not think that the enclosure of 1856, with the subsequent use of the lot, can be construed as notice to the owners of complainants' lot that at some future day the *locus* in dispute would be used as a site for a school-house. On the contrary, I think it would rather be notice that it would not be so used. I think the owner of complainants' lot may well have thought and said, "I care nothing for the right of passage over this alley, and do not object to its enclosure. Its enclosure and use as a play-ground does not interfere with the light and air from it, so I am content."

Counsel for the defendants invoked the aid of what is called the "balance of convenience" rule. They pointed out the great injury which the defendants would suffer from an interruption of the execution of their plans, by which they are bound in contract, and the comparatively slight injury to the complainants. But I do not understand that the rule appealed to applies here. The facts upon which complainants' right rests are clear and undisputed. The rights of the complainants arising out of those facts, I think, are equally clear, and have been recognized by our highest court. The case has reached the stage of final hearing, and the right invaded is a right of property. The building proposed to be erected will occupy the greater part of the alley adjoining complainants' premises, and it was admitted that it would be much higher than the fence which has stood so many years. But, were the obstruction much less, I do not see how this court could

refuse relief on account of the smallness of the injury. To leave the complainants to their remedy at law (supposing that it exists), would be to say to them that they must part with their property for such price as they may realize out of an endless series of actions for damages—a result entirely contrary to right, justice and equity.

This court has frequently and uniformly exercised its jurisdiction in similar cases and enjoined the threatened injury. *Bechtel* v. *Carslake, 3 Stock. 500; Barnett* v. *Johnson, supra; Riehle* v. *Heulings, 11 Stew. Eq. 20,* and *Gawtry* v. *Leland, 13 Stew. Eq. 323,* where the decree of this court was affirmed on appeal for the reasons given by the vice-chancellor. In that case there was a mere encroachment upon a private way, not amounting to a complete obstruction, and the vice-chancellor said : "It is not a question of convenience—of how much space is suitable for the complainant—but one of right under the covenant."

This last case is the only one of those just cited which was noticed by the court of appeals in *Hart* v. *Leonard, 15 Stew. Eq. 416,* in the classification there found of the instances in which this court will interfere by injunction on final hearing, and the reference to the cases in which it has so done. But I do not construe the omission of the others as at all discrediting them as authority.

In support of their position on this part of the case the defendants' counsel relied upon *Zabriskie* v: *Railroad Co., 2 Beas. 314; Railroad Co.* v. *Prudden, 5 C. E. Gr. 541; Higbee* v. *Railroad Co., 5 C. E. Gr. 435; Dodge* v. *Railroad Co., 16 Stew. Eq. 351.* I have carefully examined each of them. They are clearly distinguishable from the case in hand. In the first case the complaint was that the horse railroad track was laid close to the line of the sidewalk instead of the middle of the street, and its use would prevent access to complainants' abutting land. The injunction was refused on the ground that no improvements were yet made on complainants' lot, and that, until that was done, no injury resulted, and that, *in the meantime,* it was not worth while to stop the running of the cars.

In the *Prudden* and *Higbee Cases*, the relief was refused on the ground that the complainants had, in each case, acquiesced in the placing of the railroad in the street in front of their several lots, and, in the *Higbee Case*, to the placing of the station there also. In the *Prudden Case* the laying the additional track—the injury threatened—was authorized by the company's charter, and the court held that it must presumably have been contemplated by the complainant in his acquiescence.    And, in the *Higbee Case*, the addition of a platform to a station was placed in the same category.    In both cases the remedy at law was reserved to the complainants, and in the *Prudden Case* (*p. 540*) the resort to this court if the injury proved serious.

In *Dodge* v. *Railroad Co.*, the part of the street about to be obstructed had been vacated by the proper authorities, and complainants, whose land did not abut on the part vacated, fell back on the original dedication by the previous owner of their land. But it turned out that such previous owner had in some way conveyed the part of the street vacated to the railroad company before he conveyed to the complainant, who was held bound by such previous conveyance.    Besides, in both the *Prudden* and the *Dodge Cases* there was found the additional question, whether, where the private right of the abutting owner upon a dedicated street, which exists prior to its acceptance by the public, has merged, so to speak, upon its acceptance, in the higher public right, such private right revives upon a vacation of a street, which question was an unsettled one in this state.

Defendants also called attention to the location of complainants' house and to the state of the proofs as to its windows &c.    I understood it to be admitted at the hearing that it stood opposite, or nearly so, to the points of nearest approach of the proposed new school-house.    But I do not conceive that the present location or condition of complainants' house has the least effect upon their rights.    Those rights do not arise from the use of windows in their house of a particular size and location, or, indeed, of any windows, or even a house at all.    Those rights would be the same if no house had ever been erected on their lot.    Complainants have the right, at their pleasure, to erect a building covering

the whole of their lot, and to place in it such openings as they choose on the side next this alley, and to have the benefit of the light, air and ventilation to be derived from it, and that wholly irrespective of the mode and extent of which they have heretofore enjoyed it.

The conclusion at which I have arrived is contrary to my first impressions, and that circumstance, together with the public character of the interests incidentally involved, have led me into stating my reasons at a perhaps unnecessary length.

I think the complainants are entitled to the relief prayed for, and I will advise a decree accordingly.